UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DIANE BOLDERSON,                          )
                                          )
            Plaintiff,                    )
                                          )
      vs.                                 )          Case No. 4:13-CV-2223 (CEJ)
                                          )
CITY OF WENTZVILLE,                       )
                                          )
            Defendant.                    )

## MEMORANDUM AND ORDER

This matter is before the Court on the parties' cross-motions for summary judgment. The issues are fully briefed.

Plaintiff Diane Bolderson alleges that defendant City of Wentzville terminated her employment in retaliation for engaging in protected speech in violation of her rights under the First Amendment and that she was treated differently than similarly-situated others based on her gender. She brings claims pursuant to 42 U.S.C. § 1983 and the Missouri Human Rights Act, Mo.Rev.Stat. §§ 213.010 *et seq*. Plaintiff seeks partial summary judgment on her First Amendment claim and defendant seeks summary judgment on both claims.

## I.    Background

Plaintiff was employed as the Building Commissioner for Wentzville from 1998 until May 10, 2013, when City Administrator Michael McDowell terminated her employment. McDowell, who took his position in March 2013, died in August 2013 before this case was filed.

The parties agree that plaintiff performed her duties without issue until 2010 when the Wentzville Board of Aldermen made changes to the building codes.

Plaintiff opposed the changes because she believed that the new codes would weaken safety standards and were too favorable to builders. <u>See</u> Plaintiff Deposition at 105-06 (plaintiff and other city officials posted 437-page rebuttal to proposed code on city website) [Doc. #49-2]. She alleges that, as a result of her opposition to the new building code, she became the target of an intimidation campaign by an influential industry group, the Home Builders Association (HBA). Complaint ¶¶ 7-19 [Doc. #1]. At various times, builders told her that she was on a "hit list" for termination and that the HBA had enough influence with the Board of Aldermen to follow through on the threat. <u>Id.</u>; <u>see also</u> Letter, Mar. 13, 2013 (documenting plaintiff's contacts with HBA members) [Doc. #53-5]. In August 2010, plaintiff began covertly recording conversations with city officials, builders, and aldermen. <u>See</u> Plaintiff's "Time Line of Events," at 2 [Doc. #53-31].

Plaintiff routinely received good ratings on evaluations of her job performance. <u>See</u> Amy Mixen Deposition at 118-24 (plaintiff continually met expectations between 2007 and October 2012) [Doc. #49-4]. Although he gave plaintiff positive ratings, her supervisor Doug Forebeck testified that he urged her to improve her customer service by being "a little more fair and impartial" and to "assist customers" with getting necessary approvals from her department. Doug Forebeck Deposition at 116-17, 160-69 [Doc. #49-3]. He also stated that her style "caused some frustration with management level personnel [such as the] city attorney [and] public works director." Forebeck Dep. at 169-70. Her "tendency to be very black and white in the administration of [her] duties . . . certainly add[ed] work, review, administrative duties, re-review, email traffic" and was "somewhat of a hindrance just to smooth the department operations." Forebeck Dep. at 170-71.

Plaintiff's concerns about the HBA "probably affect[ed] her day-to-day operations and how she was performing." Forebeck Dep. at 174.

In January 2011, a majority of the Board of Aldermen voted to express a lack of confidence in plaintiff's performance of her duties as the code official for the city. They identified "regain[ing] confidence in customer service, adequate documentation, improved presentation, accurate information, [and] communication skills" as areas for improvement. Mixen Dep. at 132-33. Acting on the board's instructions, then-City Administrator Dianna Wright placed plaintiff on a six-month performance-improvement plan. Mixen Dep. 132, 135-36. Plaintiff provided a written response in which she challenged the validity of the Board's criticisms. Feb. 24, 2011 Memo [Doc. #53-2].

Plaintiff continued to voice opposition to the actions of public officials. In March 2013, plaintiff submitted a request for an advisory opinion regarding the bidding process used to purchase computer equipment. Memo [Doc. #49-9]. She asked for an audit of the procurement department, opining that it had acted unethically. In a response dated April 24, 2013, City Administrator McDowell reviewed the proper use of advisory opinions and stated that he did not believe one was warranted. He informed her that she should submit a "Report of Possible Violations" form if she believed an ethical violation had occurred. Memo [Doc. #49-10]. Plaintiff did not file the form.

In 2012 and 2013, defendant undertook construction of a large aquatic park known as the "Splash Station." As building commissioner, plaintiff was responsible for inspecting the project to certify it was in compliance with all building codes. Scott Hitchcock Deposition at 62 [Doc. #49-6]. Design and construction oversight

was provided by the firm Planning Design Studio (PDS). In late 2012, Wentzville officials became aware that the project required more rock excavation than anticipated, based on test borings taken at the building site. The additional excavation slowed construction and increased costs. Douglas Lee Affidavit ¶¶4-5, 8-10 [Doc. #53-43]. Officials discovered that PDS had decided to shift the location of some of the project features without informing them.[1] Lee Aff. ¶¶13-14.

In early 2013, the Board of Aldermen directed officials to seek proposals from construction firms to take over management of the Splash Station project. Douglas Lee Deposition at 72-73 [Doc. #49-19]; see also Board of Aldermen Minutes, Apr. 10, 2013, at 3 (McDowell reported that the board had directed staff to seek proposals from construction firms to complete project) [Doc. #49-12]; see also Apr. 5, 2013 Request for Proposals [Doc. 49-11]. Proposals were received from CCS Group, Inc., which requested $80,000 for the work, and from Gartenberg Construction Consulting, which requested $87,300, plus reimburseable expenses. Proposals [Docs. #49-13, #49-14].

On April 10, 2013, the Board of Aldermen voted to terminate the contract with PDS. Minutes at 3. McDowell then presented the proposals from CCS and Gartenberg. He noted that CCS had worked with PDS in developing the initial construction schedule and opined that CCS should be disqualified based on that

---

[1] Plaintiff objects to the admission of Mr. Lee's affidavit, arguing that it is inconsistent with his prior deposition testimony. Pl. Response to Def. Statement of Facts, at 15-17. [Doc. #57]. Lee testified in deposition that PDS "was blamed taking the boring [sic] and not accounting for that and there were some shifts in the plan that moved deeper structures off of the boring locations." He further testified that PDS was responsible for making the shifts. Lee Dep. at 98 [Doc. #49-19]. The court finds no inconsistency between Lee's deposition testimony and his affidavit.

association. Meeting Video at 35:00 to 42:30.[2] McDowell stated that he had previously worked with Michael Gartenberg and recommended that the board accept his proposal. After discussion, the board voted to retain Gartenberg to oversee completion of the Splash Station. Minutes at 3-4.

Plaintiff opposed the board's decision to terminate PDS and hire Gartenberg. On April 22, 2013, she wrote an interdepartmental memorandum in which she asserted that Gartenberg could not provide project oversight because he was not a licensed engineer or architect. Memo [Doc. #53-11]. She also stated that the defendant's decision to proceed without a licensed professional violated Missouri law. Finally, she reported that there were critical change orders for the Splash Station project that she could not approve until an engineer of record was in place. She acknowledged that Gartenberg planned to re-engage the project's prior design professionals and engineers, but argued that Gartenberg's services were therefore unnecessary.

Between April 24, and April 30, 2013, plaintiff sent emails to a number of Wentzville employees requesting a complete copy of the Gartenberg contract. [Doc. #49-17 at 10-17]. Noting that the only copies she had seen were incomplete, plaintiff wrote, "I'm wondering . . . if the full agreement was not presented to the board, this may be considered Fraud on [Director of Procurement Jerry Hillin's] part because he never provided it to the City Clerk and the board made a decision

---

[2]Video available online at:http://wentzvillemo.iqm2.com/Citizens/SplitView.aspx?
Mode=Video&MeetingID=1546&Format=Minutes. Plaintiff objects to the consideration of this evidence because defendant did not produce the videotape during discovery. The video was equally available to both parties and defendant was under no obligation to produce it. Plaintiff's objection is overruled.

without full knowledge." Id. at 16. She also suggested that Hillin was deliberately suppressing the final contract. Id. at 17.

Plaintiff also sent emails regarding the Gartenberg contract to Mayor Nicholas Guccione at his private account. [Docs. #53-11, #53-14, #53-18, #53-21]. In an email dated April 24, 2013, plaintiff challenged whether Gartenberg carried sufficient insurance and called him "a loser." She stated that city administrator "McDowell was wearing a black hat" and called the Gartenberg contract a "kickback." [Doc. #53-14]. Plaintiff had previously been told by interim city administrator George Kolb that she was not to speak to the mayor. Pl. Dep. 224-25. Plaintiff acknowledges that she received this instruction, but contends that Mayor Guccione subsequently told her that she could speak with him whenever she wanted to and that his wife gave her their private email address. Id.

On May 6, 2013, plaintiff submitted a report pursuant to city's newly-implemented Anti-Fraud and Corruption Policy (policy). Report [Doc. #53-22]. The policy required plaintiff to submit her report to her supervisor Doug Forebeck. Policy § 5 [Doc. #53-33] (employees are to report suspicious activities to their supervisor, unless they believe supervisor is involved). Instead, she emailed it to Mayor Guccione, the city attorney, the human resources director, the parks director, and the city engineer, Scott Hitchcock, who filed his own report of possible fraud the following day. Included in plaintiff's May 6th email was the official form for reporting suspected fraud, a lengthy narrative, her emails seeking a copy of the Gartenberg contract, and her April 22, 2013 interdepartmental memo. Plaintiff reported "the Board of Aldermen, the City Administrator and Jerry Hillin [the director of procurement] for fraud, misrepresentation of facts, and conflicts of

interest pertaining to the Splash Station Pool Project." In particular, she criticized the Board's decision to terminate PDS, and stated that any cost overruns were due to the Board's decision to overrule staff objections to the building site. She reiterated her complaint that terminating PDS left the project without an engineer of record. Finally, she surmised that the Board must have decided to terminate PDS before its public meeting in violation of the Missouri Sunshine Law. With respect to the Gartenberg contract, plaintiff accused McDowell of concealing his real connection to Gartenberg and distorting Gartenberg's qualifications; accused Hillin of failing to follow procurement policies in soliciting the Gartenberg bid; and accused the Board of Aldermen of failing to properly inquire into the financial impact of the Gartenberg contract. She asked for "an independent investigation performed by an attorney" pursuant to the anti-fraud policy.

On May 10, 2013, City Administrator McDowell terminated plaintiff's employment. In a memorandum dated May 13, 2013, McDowell stated that she was terminated for the following reasons:

> 1.     You have disparaged elected officials in the way that they have exercised their discretion in establishing City policy and directing work to be accomplished.
>
> 2.     You have engaged your work as policy official for the City in such a way that the administration has lost confidence in how your advice is formulated and given, how it is received by those to whom it is provided, and how you comport yourself after policy decisions are made with which you disagree.
>
> 3.     You have engaged in written criticism of the Board of Aldermen's decisions for which you have no responsibility in your position.
>
> 4.     You have been insubordinate to direction that was given to you by my predecessor and by failing to follow the proper chain of command and by failing to adhere to the established protocols for

providing advice to upper level managers through whom you are to report.

5.      You have misrepresented what the law is in written reports presenting your personal opinions that certain elected and appointed City officials have engaged in illegal and/or criminal conduct for which there is no legal or factual support, all in reckless disregard of the truth.

6.      You have used City work time and equipment to engage in activities not properly within your job responsibilities and which can be disruptive to the operations of the City in contravention of elected officials' legislative prerogatives and directions.

7.      You have become disruptive of the day to day management operations of the City, undermined the authority of the Board of Aldermen and the City Administrator, and damaged any ability to work with you as you advanced your personal views of official decisions with which you disagree.

8.      Your continued unsupported criticism of City decisions and policy decisions renders you incapable of performing your duties successfully.

Administrative Memorandum [Doc. #53-26].

Plaintiff alleges that the City of Wentzville is liable for McDowell's termination of her because it has a custom, practice or policy of retaliating against whistleblowers.

Additional facts will be included in the discussion as necessary to address the issues.

## III.   Discussion

The parties have provided argument and evidence directed to plaintiff's fraud allegations. The Court expresses no opinion with respect to the validity of plaintiff's concerns or the wisdom of defendant's policy decisions as these issues are not material to plaintiff's claims.

### A.      First Amendment Retaliation Claim

To establish a prima facie case of retaliation, plaintiff must allege and prove that: (1) she engaged in activity protected by the First Amendment; (2) the defendant took an adverse employment action against her; and (3) the protected conduct was a substantial or motivating factor in the defendant's decision to take the adverse employment action. Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654-55 (8th Cir. 2007) (citing Mt. Healthy City Sch. Dist. v. Doyle, 429 U.S. 274, 287 (1977)). If the plaintiff meets this burden, the burden shifts to the defendant to demonstrate that the same employment action would have been taken in the absence of the protected activity. Id. at 655.

To determine whether plaintiff's speech is protected, the Court applies a two-step analysis. McCullough v. Univ. of Arkansas for Med. Sciences, 559 F.3d 855, 865-66 (8th Cir. 2009) (citing Pickering v. Board of Education, 391 U.S. 563, 568 (1968)). The first inquiry is "whether the employee spoke as a citizen on a matter of public concern." Anzaldua v. Northeast Ambulance & Fire Prot. Dist., 793 F.3d 822, 833 (8th Cir. 2015) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)). "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises." Id. The second inquiry is whether the employer "has produced evidence to indicate the speech had an adverse impact on the efficiency of the employer's operations." Hemminghaus v. Missouri, 756 F.3d 1100, 1111 (8th Cir. 2014) (alteration omitted). If the employer shows sufficient adverse impact on its operations, the Court applies the Pickering test, which balances "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in

promoting the efficiency of the public services it performs through its employees."
Anzaldua, 793 F.3d at 832 (quoting Pickering, 391 U.S. at 568). The inquiry into
the protected status of employee speech is one of law, not fact. Connick v. Myers,
461 U.S. 138, 148 n.7 (1983).

In her complaint and at deposition, plaintiff claimed First Amendment
protection for many of the communications discussed above. In briefing the cross-
motions for summary judgment, however, plaintiff states that the only "material"
communications are those regarding the Splash Station project. Memorandum in
Opposition [Doc. #56 at 4]; Reply Memorandum [Doc. #63 at 8 n.2]. Accordingly,
the Court's analysis will be restricted to the documents plaintiff sent to city officials
on April 22nd and May 6th, 2013.

### 1.    Matters of Public Concern

Speech involves matters of public concern "when it can be fairly considered
as relating to any matter of political, social, or other concern to the community, or
when it is a subject of legitimate news interest; that is, a subject of general interest
and of value and concern to the public.'" Lane v. Franks, 134 S. Ct. 2369, 2380
(2014) (citations omitted). An employee's private communication to her employer
may be entitled to First Amendment protection if it involves matters of public
concern. See Givhan v. West Line Consol. Sch. Dist., 439 U.S. 410, 415-16 (1979)
(right to freedom of speech is not "lost to the public employee who arranges to
communicate privately with his employer rather than to spread his views before the
public).

Plaintiff argues that her April 22nd and May 6th reports implicate matters of
public concern because she addressed waste of taxpayer money, fraud and

corruption, and violation of sunshine laws. Defendant counters that she was motivated by her own sense of grievance.

> To determine whether speech qualifies as a matter of public concern, we must examine the content, form and context of the speech, as revealed by the whole record. When speech relates both to an employee's private interests as well as matters of public concern, the speech is protected if it is primarily motivated by public concern. If the main motivation for the speech was furthering [the employee's] private interests rather than to raise issues of public concern, her speech is not protected, even if the public would have an interest in the topic of her speech.

Anzaldua, 793 F.3d at 833 (internal quotations and citations omitted; alteration in original).

"We generally have held that speech about the use of public funds touches upon a matter of public concern." Kincade v. City of Blue Springs, 64 F.3d 389, 396 (8th Cir. 1995). Speech that criticizes a public employer in his capacity as a public official also addresses matters of public concern. Belk v. City of Eldon, 228 F.3d 872, 878 (8th Cir. 2000) (employee engaged in protected speech when she reported that city administrator was rumored to be having affair with another employee); see also Casey v. City of Cabool, 12 F.3d 799, 802 (8th Cir. 1993) ("Criticism, no matter how obnoxious or offensive, of government officials and their policies clearly addresses matters of public concern."). In addition, challenges to a city's lack of compliance with sunshine laws involve matters of public concern. Lindsey v. City of Orrick, Mo., 491 F.3d 892, 899 (8th Cir. 2007). On balance, plaintiff's April 22nd and May 6th reports addressed the appropriate use of public funds, possible fraud, and violations of the Missouri laws. The Court finds that plaintiff spoke on matters of public concern.

**2.     Speech in Capacity as Citizen**

When public employees make statements pursuant to their official duties, they are not speaking as citizens for the purposes of the First Amendment, and their speech is not constitutionally protected from employer discipline. Garcetti, 547 U.S. at 421. The Garcetti "test for whether a person spoke as a citizen or as a public employee comes down to whether the speech was made pursuant to official responsibilities." Bradley v. James, 479 F.3d 536, 538 (internal quotation omitted). Determining the scope of an employee's official responsibilities for First Amendment purposes is a practical inquiry that focuses on "the duties an employee actually is expected to perform," rather than her formal job description. McGee v. Pub. Water Supply, Dist. No. 2 of Jefferson Cnty., Mo., 471 F.3d 918, 921 (8th Cir. 2006) (quoting Garcetti, 547 U.S. at 424-25).

In Garcetti, a deputy district attorney alleged that he was demoted because he wrote a memorandum arguing for dismissal of a criminal charge based on his determination that a deputy sheriff made serious misrepresentations in a search warrant affidavit. Garcetti, 547 U.S. at 414. The Supreme Court held that the plaintiff did not speak as a citizen because "writing a memo that addressed the proper disposition of a pending criminal case" was one of his job duties. Id. at 422 (employee speech is not protected if it "owes its existence" to professional responsibilities); see also Buehrle v. City of O'Fallon, Mo., 695 F.3d 807, 812 (8th Cir. 2012) (report written by police officer assigned to investigate corruption was within official duties); Bonn v. City of Omaha, 623 F.3d 587, 592 (8th Cir. 2010) (public safety auditor's admission that she prepared report pursuant to her duties defeated her claims that she was acting as a citizen rather than public official); McGee v. Public Water Supply, Dist. No. 2 of Jefferson County, Missouri, 471 F.3d

918, 921 (8th Cir. 2006) (water district manager spoke as employee because his speech concerned two projects within his overall supervisory duties and his duty to advise the board regarding legal and regulatory requirements). How the employer views the employee's expressions does not determine whether they were made pursuant to official duties. See Bonn, 623 F.3d at 593 ("The controlling factor is whether the expressions were made pursuant to [her] duties, not whether the employer ultimately approved of the expressions or related actions.")

In Lindsey v. City of Orrick, Missouri, 491 F.3d 892 (8th Cir. 2007), the Eighth Circuit found that a terminated employee's speech was made in his capacity as a citizen. Lindsey was the public works director for Orrick and was required to attend council meetings to report on public works projects. The City sent him to a day-long training seminar which included a session on the Missouri sunshine laws. Over the next two years, plaintiff repeatedly spoke at council meetings to ask the council to bring its practices into compliance with the requirements of the law. Finally, he told the mayor he was going to meet with an assistant attorney general to discuss the council's failure to comply with the law. He was fired shortly thereafter. The Eighth Circuit rejected the City's argument that Lindsey's speech was made pursuant to his job duties:

> It is undisputed that Lindsey was required to attend and to present a water, sewer and street report at these meetings. His job duties included park, water, sewer, and street maintenance, as well as supervising the employees who assisted with these duties. . . [T]here is no evidence Lindsey's job duties even arguably included sunshine law compliance. Although Lindsey attended a training seminar which included a session on the sunshine law, there is nothing in the record to suggest the City sent him to the seminar to learn about the law or that he was subsequently charged with ensuring its compliance.

Id. at 898.

With these standards in mind, the Court considers plaintiff's April 22nd and May 6th reports. As building commissioner, plaintiff was responsible for ensuring that all buildings and structures complied with applicable codes and statutes. See Job Descriptions [Doc. #53-30]. Her responsibilities included writing ordinances, adopting construction codes, issuing building permits, reviewing building plans, conducting inspections, and interacting with builders and others regarding all aspects of compliance. Id.; Plaintiff's Dep. 124 [Doc. #49-2]. With respect to the Splash Station project, plaintiff had responsibility for completing inspections and ensuring that the building plans complied with state regulations. See Plaintiff's Dep. at 87; Hitchcock Dep. at 62-63.

Plaintiff's April 22nd memorandum addressed whether Gartenberg had the necessary credentials to oversee the Splash Station project in compliance with building codes, regulations, and State law — an issue that clearly falls within her job responsibilities. The fact that plaintiff was also critical of the wisdom or ethics of selecting Gartenberg does not alter that she was speaking as the public employee with primary responsibility for enforcing building codes. See Bailey, 451 F.3d at 520 (employee's comments regarding fraud and legal violations "appear only as support for [his] personal problems" with his supervisor).

Plaintiff's May 6th fraud report also was made pursuant to her official duties. Plaintiff had an affirmative duty to report fraud and corruption, and she had been specifically instructed by McDowell to file such a report if she believed ethical violations had been committed. See Livingston v. Bartis, No. 4:06CV1574 (JCH), 2008 WL 185791 at *7 (Jan. 18, 2008) (police officers acted within official duties because they were required to report misconduct and to cooperate in

investigation). Indeed, plaintiff testified at deposition that she considered it her "duty [both] as building commissioner and as a citizen" to speak up about these issues. Pl. Dep. at 97-98. This admission is evidence that her report was prepared pursuant to her official duties. See Bonn, 623 F.3d at 592 (plaintiff admitted her report was prepared as a function of her official duties); Bailey, 451 F.3d at 520 (plaintiff's statement in report that he was acting as consultant established that he was not acting as a citizen but as an employee).

Furthermore, even if plaintiff made her statements as a private citizen rather than a public official, the Court would find that her claims fail under the Pickering balancing test. See Anzaldua, 793 F.3d at 833 (quoting Waters v. Churchill, 511 U.S. 661, 680 (1994) (plurality opinion) (declining to decide whether employee's speech was on a matter of public concern where the "potential disruptiveness of the speech . . . was enough to outweigh whatever First Amendment value it might have had.")

### 3. Adverse Effect

Before the Court can proceed with the Pickering balancing test, defendant must produce evidence to indicate that the speech had an adverse impact on the efficiency of its operations. Hemminghaus, 756 F.3d at 1111. Plaintiff argues that defendant must produce evidence of actual disruption before the Pickering test can be applied.

The Eighth Circuit has recently rejected plaintiff's argument. In Anzaldua, the court stated:

> [E]vidence of actual disruption . . . is not required in all cases. This is because we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.

> Thus [w]e have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large. And we have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern. Id.

Anzaldua, 793 F.3d at 833-34 (8th Cir. 2015) (internal quotations and citations omitted). Thus, as a matter of law, defendant is not required to put forward evidence of actual disruption.

In addition, the record contains ample evidence of actual disruption. Plaintiff's supervisor Forebeck testified that her "tendency to be very black and white," as exemplified in the April 22nd and May 6th communications, created additional work and was a hindrance to operations." Forebeck Dep. at 170-71. Doug Lee testified that plaintiff's dissatisfaction over the Splash Project created a "negative atmosphere" that "impede[d] staff's ability to function in the field," was detrimental to productivity, caused tension between the staff across departments, and called into question what the City was doing with the Splash Station. Lee Dep. at 120-22. And, in his termination letter, McDowell stated that plaintiff had disrupted day-to-day management operations. The record supports consideration of the Pickering test.

### 4.    Pickering Balancing Test

The Court considers six interrelated factors when balancing plaintiff's interest in speech against defendant's interest in promoting efficient operation of city government: (1) the need for harmony in the work place; (2) whether the government's responsibilities require a close working relationship; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded

the employee's ability to perform his or her duties. <u>Anzaldua</u>, 793 F.3d at 835. "[T]he <u>Pickering</u> balance is flexible and the weight to be given to any factor varies depending on the circumstances of the case." <u>Id.</u> (citation omitted). Of critical importance is the principle . . . that [the courts] show substantial deference" to the defendant's determination that plaintiff's speech was disruptive. <u>Anzaldua</u>, 793 F.3d at 835.

The <u>Pickering</u> factors weigh in defendant's favor. The Board of Aldermen wanted the Splash Station project completed with as little disruption as possible. <u>See</u> April 10, 2013 Board of Aldermen Meeting Video at 52:10-53:00 (Alderman Sonya Shryock states: "we have asked our staff to bring this project in faster, more efficient, and better, and cease the problems.") Under normal circumstances, the project required coordination of the efforts of multiple departments and outside contractors. As a result of the decision to transfer project management from PDS to Gartenberg, there were additional tasks that needed to be completed quickly. April 24, 2013 Minutes (Gartenberg reported that he was negotiating to reengage design engineers, reviewing safety issues, completing the transfer of plans from PDS, updating the construction schedule, and keeping city officials informed). [Doc. #53-13]. During this critical time, plaintiff was acting to halt the Gartenberg contract. In addition, plaintiff used work time to communicate her suspicions to other employees. <u>See</u> Hitchcock Dep. at 65-73 (discussing communications with plaintiff). There was also evidence that plaintiff's activities impaired her ability to perform her own duties. Forebeck Dep. at 174 (plaintiff's concerns regarding the activities of the HBA "probably affect[ed] her day-to-day operations and how she was performing."). <u>See</u> <u>Porter v. Dawson Educ. Serv. Co-op.</u>, 150 F.3d 887, 894-95

(8th Cir. 1998) (employee's "compulsion" impeded ability to perform duties and undermined effective operation of workplace). Thus, plaintiff's actions disrupted government functioning at a time when the city wanted its resources directed to the completion of the project.

It is also significant that plaintiff questioned the integrity of city employees without substantive evidence to support her suspicions. Plaintiff asserted that the procurement director had purposely submitted an incomplete copy of the Gartenberg contract to the Board of Aldermen. She also accused McDowell and Hillin of concealing information in order to have the contract awarded to Gartenberg for their own private benefit. A public employee may not use the protection of the First Amendment to "level personal attacks on various officials and employees of a public institution which causes disruption, disharmony, [and] dissention." Smith v. Cleburne Cty. Hosp., 870 F.2d 1375, 1383 (8th Cir. 1989); see also Garcetti, 547 U.S. at 420 ("while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" (quoting Connick, 461 U.S. at 154).

Finally, employee acts of insubordination may tip the balancing process in favor of the employer's interests in the efficient promotion of its services. Barnard v. Jackson Cty., Mo., 43 F.3d 1218, 1224 (8th Cir. 1995). McDowell believed that plaintiff violated a direct order from his predecessor that she not communicate with the mayor. Plaintiff asserts that Mayor Guccione rescinded this directive. Assuming that Mayor Guccione had the authority to countermand such an order, there is no evidence that McDowell knew that he had done so.

Defendant has satisfied its burden to show that its interest in the efficient functioning of the city government outweighs plaintiff's personal interests in challenging the decision to fire PDS and hire Gartenberg.[3] Barnard v. Jackson Cty., Mo., 43 F.3d 1218, 1225 (8th Cir. 1995). As a matter of law, plaintiff's termination was not made in violation of her First Amendment rights. As a result of this conclusion, it is unnecessary to address defendant's argument that plaintiff cannot establish municipal liability.

**B.      MHRA Claim**

Plaintiff also alleges that her gender was a motivating factor in her termination, in violation of the MHRA. The MHRA prohibits employers from discriminating against individuals with "because of" gender. Mo.Rev.Stat. § 213.055(1)(1)(a)). The MHRA safeguards are not identical to federal standards and can offer greater protection. Jain v. CVS Pharmacy, Inc., 779 F.3d 753, 759 (8th Cir. 2015) (citation omitted). "Unlike Title VII of the Civil Rights Act of 1964, a MHRA discrimination claimant can avoid summary judgment by showing that [gender] was a contributing factor rather than a substantial factor in the employer's decision." Id. (citing Hill v. Ford Motor Co., 277 S.W.3d 659, 665 (Mo. 2009)). "A contributing factor has been defined as one that contributed a share in anything or has a part in producing the effect." Williams v. Trans States Airlines, Inc., 281 S.W.3d 854, 867 (Mo. Ct. App. 2009) (internal quotation and citation omitted). In assessing claims under the MHRA, courts are "guided by both Missouri law and

---

[3] In addition, defendant would be able to meet its burden to demonstrate that the same employment action would have been taken in the absence of the protected activity. Davison, 90 F.3d at 655 (once plaintiff establishes prima facie case, burden shifts to defendant to demonstrate that the same employment action would have been taken in the absence of the protected activity).

federal employment discrimination case law that is consistent with Missouri law." Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 818 (Mo. 2007).

Plaintiff argues that she has produced evidence that her gender was "a contributing factor" in her termination because she was treated less favorably than a similarly-situated male employee, Scott Hitchcock. In determining whether coworkers were "similarly situated," courts analyze factors including whether the same supervisor imposed the discipline, whether the coworkers were subject to the same standards, whether they engaged in conduct of similar seriousness, and similar factors. Cox v. Kansas City Chiefs Football Club, Inc., --- S.W.3d. ---, 2015 WL 5577171, at *8 (Mo. Sept. 22, 2015) (citations omitted).

The relevant facts are as follows: In early May 2013, plaintiff and Hitchcock both filed reports of possible fraud arising from the Gartenberg contract. Plaintiff was terminated on May 10, 2013, by City Administrator McDowell. In July 2013, Hitchcock's new supervisor, Susan Mueller, directed him Hitchcock to approve invoices to pay Gartenberg for his services. Hitchcock Dep. at 92, 97. Hitchcock emailed Mueller that he "respectfully declined to process the invoices, since the contract's not in the best interest of the health, welfare, and safety of the general public." Hitchcock Dep. at 95. On July 9, 2013, Hitchcock sent an email to Mueller and Doug Lee saying that he was doing all the same duties as Gartenberg and that the Gartenberg contract was unnecessary. Hitchcock Dep. at 95-96. On July 26, 2013, Mueller wrote to Hitchcock that his "refusal to perform tasks assigned by your direct supervisor in carrying out Board of Aldermen decisions" such as "occurred on July 8 and July 9, 2013 are considered insubordination." Letter [Doc. #58-19]. Mueller further stated that she was recommending disciplinary action "up

to and including termination." She told him that he had until August 1, 2013, to submit additional information for consideration by the City.  On August 9, 2013, City Administrator McDowell died. On August 22, 2013, Mayor Nicholas Guccione terminated Hitchcock's employment in accordance with his understanding that McDowell intended to accept Mueller's recommendation. Nicholas Guccione Deposition at 141 [Doc. #49-5].

Plaintiff argues that gender is a contributing factor because Hitchcock was not fired for more than three months after he filed his fraud report, while she was fired one day after filing her report. However, the evidence shows that Hitchcock was terminated because he refused to approve Gartenberg's invoices, not because he filed the fraud report. In addition, there is no evidence that Hitchcock "disparaged elected officials," "engaged in written criticism of [City] decisions for which [she had] no responsibility," "misrepresented what the law is," made accusations of criminal conduct "in reckless disregard of the truth," or "become disruptive of the day to day management" of the City. Plaintiff has not established that she was treated differently than a similarly-situated male employee. Accordingly, the Court finds that plaintiff has failed to submit evidence from which a reasonable fact finder could conclude that her gender was a contributing factor in her termination.

**\*\*\*\*\***

For the foregoing reasons,

**IT IS HEREBY ORDERED** that plaintiff's partial motion for summary judgment [Doc. #46] is **denied**.

**IT IS FURTHER ORDERED that** defendant's motion for summary judgment [Doc. #52] is **granted**.

A judgment in accordance with this Memorandum and Order will be separately entered.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 30th day of November, 2015.